IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

_____

No. 20-0133

_____

FILED
**November 5, 2021**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

JUSTIN J. MARCUM, a member of
The West Virginia State Bar,
Respondent

_____

Lawyer Disciplinary Proceedings
No. 17-03-552
No. 17-05-577
No. 18-06-059
No. 18-05-378

LAW LICENSE SUSPENDED AND OTHER SANCTIONS IMPOSED

_____

Submitted: September 14, 2021
Filed: November 5, 2021

Rachael L. Fletcher Cipoletti, Esq.
Chief Lawyer Disciplinary Counsel
Jessica H. Donahue Rhodes, Esq.
Lawyer Disciplinary Counsel
Office of Lawyer Disciplinary Counsel
Charleston, West Virginia
Counsel for the Petitioner

Lonnie C. Simmons, Esq.
DiPiero Simmons McGinley &
Bastress, PLLC
Charleston, West Virginia
Counsel for the Respondent

JUSTICE HUTCHISON delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. Pt. 3, *Comm. on Legal Ethics v. McCorkle,* 192 W.Va. 286, 452 S.E.2d 377 (1994).

2.      "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syl. Pt. 3, *Comm. on Legal Ethics v. Walker,* 178 W.Va. 150, 358 S.E.2d 234 (1987).

3.      "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer

i

Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors." *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

4.      "Ethical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the office." Syl. Pt. 3, *Comm. on Legal Ethics v. Roark*, 181 W.Va. 260, 382 S.E.2d 313 (1989).

**HUTCHISON, Justice**:

This lawyer disciplinary proceeding against Respondent Justin J. Marcum, a member of the West Virginia State Bar, originated in a Statement of Charges issued against him by the Investigative Panel of the Lawyer Disciplinary Board ("the Board") and filed with this Court by the Office of Disciplinary Counsel ("ODC"). Following an evidentiary hearing, the Board's Hearing Panel Subcommittee ("HPS") found that certain charges were supported by the evidence and that respondent, who, at the time of the alleged misconduct, was also serving as a member of the West Virginia House of Delegates, committed several violations of the West Virginia Rules of Professional Conduct relating, most notably, to his drug addiction and representation of a client in a drug-related criminal matter after illegally purchasing drugs from that client.

The HPS recommended that respondent's law license be suspended for a period of two years with the suspension being stayed in its entirety, in addition to other sanctions.[1] With the recommendation that the two-year suspension be stayed, the HPS

---

[1] In connection with the stay of the two-year suspension, the HPS recommended that respondent be placed on supervised probation for the remaining period of respondent's contract with the Judicial and Lawyer Assistance Program ("JLAP") or until June 28, 2023. If any conditions or requirements of the JLAP contract or other Rules are violated, then the entire two-year suspension shall be immediately imposed after a petition to this Court. The additional sanctions recommended by the HPS are generally those that were agreed to and jointly proposed to the HPS by ODC and respondent following the evidentiary hearing. They are set forth below. *See infra*. n.2.

1

rejected the proposed sanction that was agreed upon and jointly submitted to the HPS by

ODC and respondent after the evidentiary hearing – that is, that respondent's law license

be suspended for a period of two years with a stay of the suspension

> after six months having been served [and] for imposition of a period of supervised probation for the remaining period of [r]espondent's contract with [the Judicial and Lawyer Assistance Program ("JLAP")]; automatic reinstatement at the end of the six[-]month suspension; and immediate imposition of the remaining one and a half year suspension if any conditions or requirements of the JLAP contract or other Rules of Professional Conduct are violated after a petition to [this] Court.[2]

(Footnote added).

ODC filed its objection to the HPS's recommended sanction, and this Court

directed that the matter be scheduled for oral argument and that the parties file briefs in

support of their respective positions. Oral argument was conducted on September 14, 2021.

Upon our thorough review of the briefs, the record, oral argument, and the

pertinent legal authorities, and for the reasons set forth below, we agree with the HPS's

---

[2] Otherwise, the HPS generally agrees with the sanctions jointly proposed by ODC and respondent. The HPS recommends that, in addition, the Court require that respondent (1) complete an additional nine CLE hours in ethics and/or substance abuse education in addition to the twenty-four hours already required of him by the West Virginia State Bar, with the additional nine hours being completed "within six months of this order"; (2) comply with the terms and conditions of his JLAP contract; (3) comply with the mandates of Rule 3.28 of the West Virginia Rules of Lawyer Disciplinary Procedure, if and when applicable; and (4) pay the costs of the disciplinary proceedings pursuant to Rule 3.15.

recommendation that respondent's law license be suspended for two years. However, we disagree with the HPS that the suspension should be stayed in its entirety. Instead, we find that respondent's professional misconduct warrants his removal from the practice of law for a period of six months. With the exception of the recommendation that respondent's license be automatically reinstated at the end of the six-month suspension,[3] we generally adopt the remaining sanctions as recommended by the HPS.

## I.      Facts and Procedural History

Respondent was admitted to the practice of law in West Virginia in 2011. Therefore, he is subject to the disciplinary jurisdiction of this Court and its properly constituted Board.

Respondent has maintained a solo practice in Williamson, Mingo County, since 2012.[4] Further, the misconduct giving rise to this disciplinary proceeding occurred while respondent was a duly elected member of the West Virginia House of Delegates.

---

[3] Our reinstatement procedure following suspension provides that "[a] person whose license to practice law has been or shall be suspended in this State for a period of more than three months and who shall desire reinstatement of such license shall file a verified petition in" this Court. W.Va. R. of Lawyer Disciplinary P. 3.32(a). Pursuant to Rule 3.31, automatic reinstatement is specifically reserved for lawyers who "ha[ve] been suspended for a period of three months or less" (unless otherwise provided in the suspension order), upon the satisfaction of certain conditions and requirements. Therefore, because respondent is ordered to serve six months of the two-year suspension, he is required to petition for reinstatement pursuant to Rule 3.32.

[4] Respondent was admitted to the practice of law in Kentucky in 2016.

On February 8, 2020, the Board's Investigative Panel issued a formal Statement of Charges against respondent that included four counts alleging multiple violations of the Rules. An evidentiary hearing was conducted before the HPS on September 21, 2020, at which the testimony of various witness was heard and numerous exhibits were presented.

Following the evidentiary hearing, on December 10, 2020, ODC and respondent submitted to the HPS their Joint Proposed Findings of Fact, Conclusions of Law, and Recommended Sanctions. As reflected in its report, the HPS is generally in agreement with the findings and conclusions that were jointly proposed by the parties. In the instances where the parties disputed whether the evidence supported a finding that respondent violated a particular Rule, the HPS made findings and conclusions that are favorable to respondent that ODC does not challenge in this proceeding. The HPS's findings and conclusions are summarized below.

*Count One – Complaint of Jeffrey S. Simpkins*

The parties agreed that, based upon the admissible evidence presented at the hearing, none of the charges set forth in Count One of the Statement of Charges were proven by clear and convincing evidence. *See* Syl. Pt. 1, in part, *Lawyer Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995) ("Rule 3.7 of the Rules of Lawyer Disciplinary Procedure . . . requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence.") Because, as reflected

4

in its report, the HPS agrees with the parties' proposed findings and conclusions in this regard, we need not recount the allegations in great detail.

Briefly stated, Count One stemmed from an ethics complaint filed by attorney Jeffrey S. Simpkins. Count One alleged that respondent visited K.P.B., an inmate at the regional jail, for the purpose of soliciting her as a client even though respondent knew her to be already represented by counsel (Mr. Simpkins); that respondent lied to ODC about soliciting K.P.B. as a client; and that, after respondent visited K.P.B. and allegedly obtained confidential information that was harmful to her, he was retained to represent clients who had instituted an action for slander against Mr. Simpkins related to Mr. Simpkins's representation of K.P.B. against said clients in another (but related) matter. Count One also alleged, based upon a second ethics complaint filed by Mr. Simpkins against respondent, that respondent represented a party in a divorce proceeding after previously representing both that party and his spouse in an adoption proceeding and then lied to ODC about it.[5]

For the conduct alleged in Count One, respondent was charged with violating West Virginia Rule of Professional Conduct 7.3(a) (prohibiting solicitation of professional employment); Rule 1.7(a) (prohibiting concurrent conflict of interest); Rule 1.9(a)

---

[5] Also included in Count One were allegations that respondent obtained false affidavits from several individuals "stating that they had provided Mr. Simpkins with car wreck claims in exchange for money. Mr. Simpkins believed [r]espondent was retaliating against him for filing the initial ethics complaint."

(concerning duties to former clients); Rule 1.18(c) (concerning duties to prospective clients); Rule 8.1(a) (knowingly making a false statement of material fact in connection with a disciplinary matter); Rule 8.4(c) ("engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation"), and Rule 8.4(d) (prohibiting conduct that is prejudicial to the administration of justice).

At the evidentiary hearing, respondent denied the allegations against him concerning K.P.B. and, because K.P.B. failed to appear and testify at the hearing, respondent's testimony regarding his conversation with her was unrefuted. The other testimony presented at the hearing concerning respondent's conversation with K.P.B. was either favorable to respondent's position or failed to support the factual allegations underlying the formal charges. With regard to the allegations that respondent represented a party in a divorce proceeding after he had represented that party and his spouse in adoption proceedings, video evidence from the parties' final divorce hearing showed that any possible conflict of interest was expressly waived.

*Count Two – Complaint of Lora L. Cline*

With regard to Count Two, ODC and respondent agreed that the evidence presented at the disciplinary hearing did not prove the majority of the charges set forth therein by clear and convincing evidence. Count Two alleged that respondent had a conflict of interest in representing Darrell Dotson and complainant Lora L. Cline in their effort to recover insurance proceeds after the mobile home they co-owned was destroyed by fire.

6

ODC alleged that respondent solicited Ms. Cline as a client and lied to ODC about it. For this alleged conduct, respondent was charged with violating West Virginia Rule of Professional Conduct 1.7(a) (prohibiting concurrent conflict of interest), Rule 7.3(a) (prohibiting solicitation of professional employment), Rule 8.1(a) (knowingly making a false statement of material fact in connection with a disciplinary matter), and Rule 8.4(c) ("engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation"). However, ODC and respondent jointly proposed findings and conclusions indicating that the foregoing charges were not proven at the disciplinary hearing, and the HPS agreed, as reflected in its report.

Count Two also alleged that respondent, who represented Mr. Dotson and Ms. Cline pursuant to a written standard contingency fee agreement, charged them an unreasonable fee for his legal services, in violation of Rule 1.5(a), and that respondent deprived Ms. Cline of her proper portion of the insurance proceeds due to his unreasonable fee, in violation of Rule 8.4(d). The parties did not submit joint proposed findings and conclusions as to these two charges but, instead, submitted pleadings in support of their respective positions. At the evidentiary hearing, the HPS heard testimony from an expert witness in the field of lawyer ethics that, under the facts of this case, the contingency fee charged by respondent was not excessive or inappropriate under Rule 1.5. The HPS found that ODC failed to meet its burden of proof and that the fee charged was in no way unreasonable. In this proceeding, ODC does not contest the HPS's findings of fact and conclusions of law regarding the reasonableness of respondent's fee.

7

Underlying the charges set forth in Count Three was the ethics complaint filed on February 16, 2018, by B.W.G., a police officer employed by the City of Williamson. B.W.G. alleged that respondent made false allegations against him in social media (Facebook) posts and attempted to solicit business in connection with those allegations. The offending social media posts were included in the Statement of Charges and admitted into evidence at the disciplinary hearing:

1. [B.] should be arresting drug dealers and fighting real crime instead of being public nuisance #1. He's a joke!!!

   Today, he pulled another friend over for expired licenses on his car. Friend had the sticker but didn't have it put on yet. [B.] proceeded to tow him too.

   Drug dealers everywhere and the City of Williamson is allowing [B.W.G.] to intentionally harass people. He's killing our tourism from the trails as a lot of trail riders won't come back to Williamson because of him.

   To beat it all, I'm told he's getting $50 for every tow he makes. This is pitiful and I'm calling on the City Council and everyone to do something with him. [B.] needs to go!!!

2. Guess their new lawyer will be flooded with lawsuits time this stuff is over with [B.]. Maybe we need the Feds to watch [B.] and see if his cash deal [sic] are real.

3. I want everyone to know, we will start fighting his tickets. Come see me at Marcum Law Office.

4. Then, [B.] tried to tow my dad. Dad stopped at a store and unloaded some heavy boxes from his truck for a store and pulled out. Stopped for maybe 5 minutes. He told Dad he would also be towed and said a bunch of cuss words to Dad. It's alright for [B.] to park his cruiser, leave it running,

8

waste gas, while he parks in the middle of the road for long periods of time. Probably to get free food. He said about 20 cuss words to my dad, including GD and MF. This is absolutely pitiful and uncalled for.

5. Let him do it. I'm ready for anyone who gets harassed by him. I don't care to file suit against him if y'all want.

6. [B.] is adding to the demise. It makes my jobs hard as a legislator. When we discuss companies they want to know about the roads, drug free workers, and sometimes even ask about things like what [B.] is doing. He's truly an embarrassment to the badge.

At the disciplinary hearing, respondent admitted to making the posts set forth in the Statement of Charges; provided the factual basis for making several of them; and testified that he believed that, under the First Amendment and based upon his status as a member of the West Virginia Legislature, he had a right to speak out about an issue that is impacting his community.

For failing to list himself or his law firm in these Facebook posts, respondent was charged with violating West Virginia Rule of Professional Conduct 7.2(c), concerning lawyer advertising, which provides as follows: "Any communication made pursuant to this Rule shall include the name and office address of at least one lawyer or law firm responsible for its content." For failing to use "Advertising Material" in his Facebook posts, respondent was charged with violating Rule 7.3(c), which provides that

> [e]very written, recorded or electronic communication from a lawyer soliciting professional employment from anyone known to be in need of legal services in a particular matter shall include the words "Advertising Material" on the outside envelope and at the beginning and ending of any recorded, if any, or electronic communication, unless the recipient of the communication is a person specified in (a)(1) or (a)(2).

9

During the evidentiary hearing, respondent acknowledged that his Facebook posts failed to include either the name and address of at least one lawyer or law firm responsible for the content or the words "Advertising Material."

In their jointly proposed findings and conclusions, the parties agreed that the charges involving respondent's failure to list himself or his law firm in his Facebook posts and his failure to use "Advertising Material" in his posts were proven by clear and convincing evidence and that he violated Rules 7.2(c) and 7.3(c), respectively. The HPS agreed and adopted these findings and conclusions.[6]

*Count Four – Complaint of ODC*

Underlying the charges set forth in Count Four was a complaint filed by ODC that was precipitated by a report made by attorney Robin P. Cisco on July 23, 2018.[7] Sometime prior to April 25, 2018, respondent purchased drugs (Oxycodone) from Jackie Lee Marcum (no relation to respondent) at Mr. Marcum's home. Mr. Marcum was

---

[6] Respondent was also charged with using Facebook posts to embarrass B.W.G., in violation of Rule 4.4(a), which provides, in relevant part, that, "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass . . . a third person[.]" In their jointly proposed findings and conclusions, respondent and ODC agreed that the evidence presented at the disciplinary hearing failed to prove this charge. The HPS agreed and adopted this finding and conclusion.

[7] *See* W. Va. R. Prof. Conduct 8.3(a) ("A lawyer who knows that another lawyer has committed a violation of the Rules . . . that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.")

subsequently indicted on charges of one count of delivery of a controlled substance (unrelated to his sale of drugs to respondent) and three counts of conspiracy to deliver a controlled substance in the Circuit Court of Mingo County. Ms. Cisco was appointed to represent Mr. Marcum. However, on April 25, 2018, at Mr. Marcum's arraignment, Mr. Marcum advised Ms. Cisco that respondent would be representing him.[8]

In June of 2018, respondent negotiated a plea agreement whereby Mr. Marcum pled guilty to two counts of conspiracy to deliver a controlled substance, which provided for a period of incarceration. After entry of the plea agreement but before Mr. Marcum was sentenced, respondent withdrew as Mr. Marcum's counsel.[9] Thereafter, Ms. Cisco was again appointed to represent Mr. Marcum. While reviewing discovery provided by the State in Mr. Marcum's case, Ms. Cisco viewed video surveillance footage that showed respondent driving his vehicle bearing his "House of Delegates" license plate to

---

[8] Respondent was present in the courtroom that day along with other lawyers and their clients waiting for their cases to be called. Mr. Marcum testified that respondent approached him "and told me he'd take care of me." Respondent testified, however, that when the circuit judge called Mr. Marcum's case for his arraignment, it was Mr. Marcum who announced that respondent would be representing him.

[9] On June 14, 2018, respondent filed a motion to withdraw as Mr. Marcum's counsel on the ground that he "has become aware of a possible conflict." Subsequently, on June 19, 2018, respondent advised Mr. Marcum by letter that he was withdrawing as Mr. Marcum's counsel "due to your unpaid attorney fees." Also, on that date, respondent filed a second motion to withdraw on the ground that Mr. Marcum had failed to pay his legal fees.

Mr. Marcum's home and Mr. Marcum giving respondent pills in exchange for money.[10]

Also included in the discovery items Ms. Cisco reviewed was a ledger that Mr. Marcum kept that tracked individuals who owed him money for the purchase of drugs in which respondent's name appeared.[11] According to Mr. Marcum's testimony, he sold Oxycodone pills to respondent on numerous occasions prior to respondent representing him and, after respondent began representing him in the criminal matter described herein, Mr. Marcum interpreted a conversation he had with respondent to mean that Mr. Marcum would pay respondent for his legal services with drugs.[12] Ultimately, Ms. Cisco was able to have Mr. Marcum's plea agreement set aside and to negotiate a new, more favorable agreement.[13]

---

[10] The surveillance video belonged to Mr. Marcum and was confiscated by law enforcement when Mr. Marcum was arrested for the crimes for which he was indicted. Neither Mr. Marcum nor respondent have been charged with a crime in connection with respondent's purchase of drugs from Mr. Marcum that is depicted on the video.

[11] Mr. Marcum testified that respondent did not review any discovery with him before entering into the plea agreement. He also testified that respondent asked him if he (respondent) could be seen in surveillance video from Mr. Marcum's home, to which Mr. Marcum replied, "I ha[ve] no idea." In contrast, respondent testified that he reviewed the discovery with Mr. Marcum and that the only video footage provided depicted Mr. Marcum selling drugs to a confidential informant. Respondent testified that neither the video footage where he can be seen purchasing drugs from Mr. Marcum nor the ledger with his name on it was included in the discovery provided to him while he was representing Mr. Marcum.

[12] When asked by ODC at the disciplinary hearing how he "pa[id] [respondent] for his representation[,]" Mr. Marcum responded that "there was [sic] times I would give him pills." Mr. Marcum testified that, between April 25, 2018 and May 9, 2018, he was out of jail on bond and that, during that period, he paid respondent in drugs one time.

[13] Under the plea agreement negotiated by Ms. Cisco, Mr. Marcum pled guilty to one count of delivery of a controlled substance, with a recommendation by the State for alternative sentencing. Mr. Marcum was sentenced to nine months of home confinement

Continued . . .

Respondent admitted that, while he was a licensed attorney and a member of the State legislature, he engaged in illegal activity by purchasing drugs from Mr. Marcum one time. Specifically, he admitted that he purchased drugs from Mr. Marcum on the one occasion that was depicted in the video footage recorded at Mr. Marcum's home.[14] However, respondent denied knowing that video footage of his drug purchase existed, denied seeing Mr. Marcum's drug ledger with his (respondent's) name in it,[15] and denied asking Mr. Marcum to pay for legal services with drugs.

With regard to the allegation set forth in Count Four that respondent had a conflict in representing Mr. Marcum after respondent purchased illegal drugs from him, respondent was charged with violating West Virginia Rule of Professional Conduct 1.7(a). That rule provides, in relevant part, that

---

followed by three years of probation, a condition of which required that he cooperate with ODC in connection with this disciplinary proceeding.

[14] Contrary to respondent's testimony that he purchased drugs from Mr. Marcum only one time, Mr. Marcum testified that, before respondent represented him on the drug charges described herein, he sold respondent Oxycodone pills in groups of ten for $500 two to three times a week over a three-to-four-month period. Mr. Marcum also testified that, on one occasion, he provided respondent with drugs in exchange for sports memorabilia. Respondent admitted that he gave Mr. Marcum sports memorabilia but denied doing so in exchange for drugs.

[15] Mr. Marcum testified that the ledger included only the names of individuals who owed him money and that if an individual paid for the drugs at the time Mr. Marcum provided the drugs, the individual's name was not written in the ledger. It is unclear whether respondent's name was written in the ledger in connection with his purchase of drugs from Mr. Marcum that appeared on the video (where respondent is seen paying for them and which respondent testified was the only time he made such purchase).

a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

*Id.*

Count Four also alleged that respondent purchased illegal drugs (Oxycodone) from Mr. Marcum, in violation of Rule 8.4(b), which defines "professional misconduct for a lawyer" as "commit[ting] a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]" It was also alleged that respondent "worked out a plea offer with [Mr.] Marcum without explaining his own involvement in the purchase of illegal drugs from [Mr.] Marcum," in violation of Rule 8.4(d). That rule defines "professional misconduct for a lawyer" as "engag[ing] in conduct that is prejudicial to the administration of justice[.]" *Id.* Respondent and ODC agreed that the evidence presented at the disciplinary hearing proved that respondent violated Rules 1.7(a), 8.4(b), and 8.4(d) as alleged in the Statement of Charges.

Count Four also alleged that respondent failed to put the fee agreement with Mr. Marcum in writing, in violation of Rule 1.5(b).[16] ODC and respondent agreed that the evidence presented at the disciplinary hearing did not prove that charge.

Finally, respondent was charged with providing false information to ODC in the investigation of this complaint, in violation of Rules 8.1(a) and 8.4(c). The parties were unable to agree as to whether the evidence sufficiently proved this charge and, accordingly, submitted pleadings to the HPS in support of their respective positions. ODC argued that respondent lied during the course of the investigation and at the disciplinary hearing when he denied that Mr. Marcum paid for respondent's legal services with drugs. ODC argued that Mr. Marcum had no reason to fabricate that such an arrangement existed and that, in fact, disclosing it did not inure to his benefit considering that such an arrangement constituted continued illegal activity on the part of Mr. Marcum. For his part, respondent argued that he testified truthfully that he purchased drugs from Mr. Marcum only one time and that Mr. Marcum never paid respondent for his legal services with drugs. Respondent argued that Mr. Marcum was unable to provide the HPS with any specific information about how and when he paid respondent with drugs during the short period of time that he was out of jail. According to respondent, Mr. Marcum's testimony was simply not credible

---

[16] Rule 1.5(b) states, in relevant part, that "[t]he scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client in writing . . . ." At the disciplinary hearing, respondent produced a written fee agreement signed by Mr. Marcum.

whereas respondent testified that his addiction recovery process requires that he be completely open and honest about his actions.

The HPS concluded that sufficient evidence was not presented on the charge that respondent provided false information to ODC, in violation of Rules 8.1(a) and 8.4(c) because "the testimony presented on this was contradictory and . . . the testimony of the witness [Mr.] Marcum was not credible or sufficient to make that finding."

In connection with the charges set forth in Count Four, the HPS also heard testimony about respondent's drug addiction, treatment, and recovery process. Respondent testified that he had previously been prescribed medication for anxiety and pain, admitted that he began using illegal drugs in December of 2017 or January of 2018, and that he continued to use illegal drugs for approximately six months. He admitted that he was addicted to drugs and that his addiction issues affected his ability to practice law.

In early June of 2018, respondent entered an addiction treatment facility in Tennessee, where he was diagnosed with chemical dependencies, specifically benzodiazepines, tranquilizers like Valium and Xanax, and opiates. After successfully completing the treatment program, respondent began the JLAP monitoring program. Robert E. Albury, Jr., JLAP's executive director, testified that respondent entered the program on June 29, 2018, beginning with a two-year commitment and that he

16

subsequently agreed to a five-year monitoring program.[17] According to Mr. Albury, respondent has complied with all of the conditions required under the JLAP program, including never testing positive for alcohol or drugs. He testified that respondent's "behavior is indicative of one who is committed to working a personal program of recovery." Mr. Arbury also testified that while respondent's conduct as alleged in the disciplinary proceedings "is typical of the unmanageability, insanity and . . . lack of value clarification that is indicative of addiction. . . . I have seen a huge change in him over the years and not only in us helping him, but him helping us help [ot]her lawyers who have followed in his footsteps." According to Mr. Albury, respondent's record "documents a history of rehabilitation . . . [and] I believe [respondent] is no longer a threat to the client public."

Louis Dante DiTrapano also testified at respondent's disciplinary hearing. Mr. DiTrapano is a lawyer practicing in Charleston, West Virginia, who, having personally experienced addiction issues, serves as respondent's JLAP peer mentor. Mr. DiTrapano testified that he texts or speaks with respondent every day and sees him at weekly JLAP meetings. He believes that respondent is doing extremely well in his recovery, including

---

[17] Mr. Albury testified that monitoring "is designed to provide support, structure and accountability to individuals in recovery as well as to provide a safety mechanism to protect the client public." In addition to regular drug and alcohol testing, a monitoring agreement involves verification of regular attendance at twelve-step AA or NA meetings and participation in a recovery support group for lawyers. Additionally, JLAP monitored respondent's compliance with clinical recommendations (i.e., his outpatient treatment) and currently monitors respondent's individual therapy and maintaining a record of his compliance with the same.

17

dealing with the present disciplinary proceedings. During their two-year relationship, Mr. DiTrapano has observed respondent grow significantly as a husband, father, and lawyer.

Finally, Charles Eubanks, respondent's AA sponsor, testified that he has regularly attended AA meetings with respondent. Mr. Eubanks testified that respondent has been attending meetings three times per week since September or October of 2018 and that he has observed respondent successfully go through the AA program.

In its report issued on February 8, 2021, the HPS recommended the following sanctions:

(1) That [r]espondent's law license be suspended for a period of two years, however, the suspension shall be stayed and the [r]respondent placed on supervised probation for the remaining period of [r]espondent's contract with JLAP or to June 28, 2023. Further, there shall be the immediate imposition of the entire two year suspension if any conditions or requirements of the JLAP contract or other Rules of Professional Conduct are violated after a petition to [this] Court;

(2) That [r]espondent complete an additional [nine] CLE hours in ethics and/or substance abuse education in addition to the [twenty-four] hours already required of him by the State Bar, but the additional [nine] hours must be completed within six months of this order;

(3) That respondent comply with the terms and conditions of his JLAP contract;

(4) That respondent must comply with the mandates of Rule 3.28 of the Rules of Lawyer Disciplinary Procedure, if and when applicable; [and]

(5) Respondent be ordered to pay the costs of these proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

The HPS stated in its report that "lawyers who engage in the type of conduct exhibited by Respondent must be removed from the practice of law for some period of

18

time[,]" and that when the privilege of practicing law is abused, it should be revoked in order to deter other lawyers from acting similarly and to restore faith in and integrity to the legal system. Nonetheless, the HPS was persuaded by the testimony concerning respondent's "rehabilitation and the efforts made in overcoming the circumstances which led to the violations in this case by Respondent . . . . particularly the progress that the Respondent has made through JLAP." The HPS found Mr. Albury's testimony to be particularly compelling and that the mitigating circumstances in this case justify "the deferral of the two[-]year suspension . . . . find[ing] little utility in this case in imposing [six] months of the suspension [as agreed to and jointly proposed by ODC and respondent] given the progress made by the Respondent with JLAP." As previously noted, ODC objects to this recommendation.

## II. Standard of Review

This Court considers the report and recommendation of the HPS under the following standard:

> A *de novo* standard applies to a review of the adjudicatory record made before the [HPS] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [HPS's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [HPS's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record."

Syl. Pt. 3, *Comm. on Legal Ethics v. McCorkle,* 192 W.Va. 286, 452 S.E.2d 377 (1994).

19

Although we give respectful consideration to the recommendations of the HPS regarding sanctions to be imposed upon an attorney for ethical violations, we have held that "'[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law.' Syllabus point 3, *Committee on Legal Ethics of the West Virginia State Bar v. Blair,* 174 W.Va. 494, 327 S.E.2d 671 (1984)." Syl. Pt. 1, *Lawyer Disciplinary Bd. v. Scott,* 213 W.Va. 209, 579 S.E.2d 550 (2003).

We are further mindful of the multiple considerations in these cases:

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

Syl. Pt. 3, *Comm. on Legal Ethics v. Walker,* 178 W.Va. 150, 358 S.E.2d 234 (1987). With these standards to guide us, we now consider the case before us.

### III.    Discussion

The HPS's findings and conclusions, which are based largely on those agreed upon by the parties, are not challenged in this proceeding. We give substantial deference to the HPS's findings of fact and, having determined that they are "supported by reliable, probative, and substantial evidence on the whole record[,]" syl. pt. 3, in part, *McCorkle*,

20

192 W. Va. at 287, 452 S.E.2d at 378, we adopt the same.[18] Similarly, upon our de novo review of the record below, we further adopt the HPS's conclusions of law. *See id.*

The present dispute lies solely with the propriety of the HPS's recommended sanction. Therefore, we focus our discussion on the proven misconduct that the parties and HPS agree constitute violations of the Rules and that we conclude warrant a harsher sanction than that which the HPS recommends.

In urging this Court to adopt the HPS's recommendation that the agreed-upon two-year suspension of his law license be stayed in its entirety, with conditions, respondent acknowledges that, in prior disciplinary cases involving a lawyer's use or possession of illegal drugs, we have imposed a two-year suspension of the lawyer's law license. However, respondent contends that, in some circumstances, the Court has granted retroactive credit towards suspension[19] or has stayed the suspension while also imposing

---

[18] With respect to Count Four, we note that there was considerable conflicting evidence concerning whether Mr. Marcum paid respondent for his legal services with drugs and whether respondent purchased drugs from Mr. Marcum more than once. The HPS found that Mr. Marcum's testimony was not credible and that ODC failed to prove the allegation that respondent lied to ODC in this regard. We have said that because the HPS "is in a better position than this Court to resolve the factual disputes that may arise" in that it "hears the testimony of witnesses firsthand and, being much closer to the pulse of the hearing, is much better situated to resolve such issues as credibility[,]" we give substantial deference to its "factual findings and factual conclusions." *McCorkle*, 192 W. Va. at 290, 452 S.E.2d at 381.

[19] *See Office of Disciplinary Counsel v. Alderman*, 229 W. Va. 656, 734 S.E.2d 737 (2012); *Committee on Legal Ethics v. White*, 189 W. Va. 135, 428 S.E.2d 556 (1993).

other conditions such as regular monitoring.[20] Respondent argues that, in his case, the HPS correctly recognized that his significant progress in the JLAP monitoring program, coupled with the existence of multiple mitigating factors, similarly justify a stay of the recommended suspension.

Our consideration of the appropriate sanction in a lawyer disciplinary proceeding is guided by syllabus point four of *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998), which held:

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

We evaluate these factors with the understanding that "attorney disciplinary proceedings are primarily designed to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice[.]" *Comm. on Legal Ethics v. Keenan*, 192 W. Va. 90, 94, 450 S.E.2d 787, 791 (1994).

---

[20] *See Lawyer Disciplinary Bd. v. Sidiropolis*, 241 W. Va. 777, 828 S.E.2d 839 (2019).

Our consideration of the first *Jordan* factor leads us to conclude that respondent's misconduct violated duties owed to his client, the public, the legal system, and the legal profession. 204 W. Va. at 497, 513 S.E.2d at 724, Syl. Pt. 4. We have already established – and respondent does not dispute – that he violated his duty to Mr. Marcum by failing to avoid a conflict of interest when he represented Mr. Marcum on charges related to the sale of drugs after respondent himself purchased drugs from him. Respondent also violated his duties to the public, the legal system, and the legal profession by purchasing, possessing, and using illegal drugs and by representing a client with whom respondent committed an illegal act and then failing to negotiate a plea agreement that would have most benefited that client.[21] The record supports the HPS's findings and conclusions that respondent violated his duties to his client, the public, the legal system, and the profession.

The second *Jordan* factor is whether respondent "acted knowingly, intentionally, or negligently." *Id.* at 497, 513 S.E.2d at 724, Syl. Pt. 4. The HPS found simply that "[r]espondent's representation of Jackie Marcum was intentional." We agree. We also find that respondent acted knowingly and intentionally in violating the law by purchasing, possessing, and using illegal drugs and by failing to avoid a conflict of interest

---

[21] With respect to respondent's misconduct relating to the Facebook posts, the HPS found that respondent violated his duty to the legal profession by failing to properly advertise his legal services, but that the evidence showed that this violation was "unintentional." The HPS concluded that this violation was "minor" and, on its own, would warrant an admonishment or reprimand. We agree.

in his representation of Mr. Marcum, with whom he engaged in illegal activity. Respondent clearly knew that he had a conflict of interest in representing Mr. Marcum.

Next, we examine the amount of the actual or potential injury caused by respondent's misconduct, as required by the third *Jordan* factor. *See id.* The potential injury to Mr. Marcum was great. Respondent helped to facilitate a plea agreement pursuant to which Mr. Marcum pled guilty to two felony offenses and which provided for a period of incarceration. Were it not for Ms. Cisco's discovery of respondent's illegal activity and conflict of interest in representing Mr. Marcum, Mr. Marcum would have been sentenced pursuant to that agreement and incarcerated. Moreover, respondent's actions in engaging in illegal activity with his own client were particularly harmful to the legal system and legal profession. As noted by the HPS, previously, members of the legal community in Mingo County have faced serious discipline and, as Ms. Cisco testified, respondent's misconduct "was another stain on the legal community" there. Finally, the fact that respondent held elective office at the time he engaged in the criminal activity and unethical misconduct herein described violated the public trust and, thus, caused actual harm to the public. *See Comm. on Legal Ethics v. Roark*, 181 W. Va. 260, 265, 382 S.E.2d 313, 318 (1989).

In determining the appropriate sanctions to be imposed upon respondent, we examine his conduct in light of both mitigating and aggravating factors. "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." *Scott*, 213 W. Va. at 209, 579 S.E.2d at 550, Syl. Pt. 2. As we explained more fully in syllabus point three of *Scott*,

24

[m]itigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

*Id.* at 210, 579 S.E.2d at 551, Syl. Pt. 3.

The HPS identified multiple mitigating factors, including the absence of a prior disciplinary record, respondent's inexperience in the practice of law, his chemical dependency and interim rehabilitation, personal or emotional problems, full and free disclosure to the Board or cooperative attitude toward the proceedings, good character or reputation, physical or mental disability or impairment, no delay in the disciplinary proceedings, and expression of remorse. From our review of the record, we agree with the HPS that these mitigating factors exist in this case.

By contrast, "[a]ggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." *Id.,* Syl. Pt. 4. The HPS found, and we agree, that respondent's purchase of illegal drugs from Mr. Marcum constitutes an aggravating factor. And, while the HPS did not make a specific finding in this regard, we find that the fact that respondent held public office at the time he violated the Rules is an additional aggravating factor. *See Lawyer*

25

*Disciplinary Bd. v. Busch*, 233 W. Va. 43, 56, 754 S.E.2d 729, 742 (2014); *Scott*, 213 W. Va. at 216-17, 579 S.E.2d at 557-58. Further, the HPS found that respondent did not act dishonestly or with a selfish motive and considered this in mitigation of discipline. We do not agree. Respondent contends that his actions were a consequence of his addiction rather than a product of a dishonest or selfish motive. We find that, based upon the evidence presented, it can reasonably be inferred that respondent represented Mr. Marcum and negotiated a plea agreement on his behalf without disclosing respondent's own involvement in the purchase of illegal drugs from him, at least in part, to hide his own illegal and unethical conduct. In this regard, we find that respondent acted dishonestly and with a selfish motive and that this is an aggravating factor to be considered.

Turning to the question of the appropriate sanction in this case, we are mindful that, in prior disciplinary cases involving the use of illegal drugs, we have imposed multi-year suspensions. *See Office of Disciplinary Counsel v. Sidiropolis*, 241 W. Va. 777, 789, 828 S.E.2d 839, 851 (2019); *Office of Disciplinary Counsel v. Alderman*, 229 W. Va. 656, 661, 734 S.E.2d, 737, 742 (2012); *McCorkle*, 192 W. Va. at 293, 452 S.E.2d at 384; *White*, 189 W. Va. at 140, 428 S.E.2d at 561; *Roark*, 181 W Va. at 265, 382 S.E.2d at 318. Still, in such cases, "this Court, rather than endeavoring to establish a uniform standard of disciplinary action, will consider the facts and circumstances in each case, including mitigating facts and circumstances, in determining what disciplinary action, if any, is appropriate[.]" Syl. Pt. 2, in part, *Comm.on Legal Ethics v. Mullins*, 159 W. Va. 647, 226

S.E.2d 427 (1976), *overruled on other grounds by Comm. on Legal Ethics v. Cometti*, 189 W. Va. 262, 430 S.E.2d 320 (1993).

Respondent contends that he was open and forthright with ODC and the HPS about his drug addiction and the allegations set forth in the Statement of Charges and that his demonstrated progress in his recovery and rehabilitation, as well as his on-going participation in the JLAP monitoring program, should be recognized and given significant weight in determining the appropriate discipline. Respondent compares his case to that of the lawyer disciplined in *Sidiropolis*. In that case, Mr. Sidiropolis became addicted to opioids that he was prescribed for back pain following an automobile accident. He eventually began using heroin as it was "a stronger and cheaper alternative for managing his pain." *Id.* at 781, 828 S.E.2d at 843. After Mr. Sidiropolis's vehicle was stopped by law enforcement and ten bricks of heroin were discovered inside, he was charged with federal drug crimes. *See id.* Disciplinary proceedings were instituted against him with the filing of a one-count Statement of Charges charging him with violating West Virginia Rule of Professional Conduct 8.4(b) based upon his criminal acts involving the unlawful possession of heroin, to which Mr. Sidiropolis stipulated. *Id.* at 784, 828 S.E.2d at 846. Like respondent in this case, Mr. Sidiropolis sought assistance from JLAP and a twelve-step addiction recovery program to help him overcome his substance abuse. In recognition of Mr. Sidiropolis's "hard-earned recovery and his dedication to that of others around him," *id.* at 788, 828 S.E.2d at 850, and "the great strides he has achieved to make amends for his prior conduct, to restore his competence as a practicing attorney, and to help others

27

overcome addictions[,]" this Court adopted the HPS's recommendation that his law license be suspended for two years, "with Mr. Sidiropolis immediately serving sixty days of the suspension" and the remainder being stayed, with conditions. *Id.*

Respondent argues that his case is similar to Mr. Sidiropolis's in that both lawyers recognized their substance abuse and demonstrated that they have been successful in drug treatment programs and in the JLAP monitoring program. Respondent also suggests that his conduct was less egregious than Mr. Sidiropolis's in that he has never been charged with any crime, "was not found to have ten bricks of heroin in his possession," and "was never charged with conspiracy to distribute heroin." Respondent contends that the HPS's recommendation in his case that he be suspended for two years with a stay of the suspension, with conditions, is fair and appropriate under the circumstances.

We commend respondent's recognition of his addiction and success in treatment and continued rehabilitation.

> As addiction has come to be recognized as a disease rather than a character flaw, . . . much more emphasis in every arena has been placed on facilitating recovery rather than strictly punishing addicts. Nonetheless, a license to practice law is a privilege, not a right. It is actually much more than a privilege; it is a trust imbued with substantial ethical obligations that must be zealously respected and observed. It reposes in a person the ability to advocate for the interests of others in their freedom and their property.

*Id.* (Workman, J., concurring). It was respondent's violation of this trust as it related to his relationship with Mr. Marcum that distinguishes his case from *Sidiropolis*. Mr. Sidiropolis

28

took the affirmative step of obtaining co-counsel for a number of cases as he began winding down his practice in order to get help with his drug addiction. *Id.* at 781, 828 S.E.2d at 843. We found that, in so doing, Mr. Sidiropolis "thereby protected his clients' interests, at least in terms of the minimum standard required of lawyers." *Id.* at 786, 828 S.E.2d at 848. Similarly, in *Alderman*, the respondent lawyer was the subject of disciplinary proceedings based upon his conviction of two misdemeanor crimes relating to his addiction to drugs. In ordering that Mr. Alderman's law license be suspended for two years, with one year served retroactively based on his voluntary withdrawal from the practice of law and one year held in abeyance pending two years of supervised practice, with conditions, this Court emphasized that "Mr. Alderman's criminal acts did not . . . have any deleterious effect upon his representation of clients in his legal practice." 229 W. Va. at 660, 734 S.E.2d at 741. Rather, the evidence showed that "Mr. Alderman engaged in substantial effort to prevent his drug addiction from adversely affecting any client cases and, in fact, voluntarily disengaged himself from the practice of law" for sixteen months. *Id.*[22]

In respondent's case, rather than take deliberate steps to ensure that his drug addiction did not adversely impact his client's interests, respondent knowingly represented a client with whom he had a conflict of interest and with whom he engaged in criminal activity. Further, he proceeded to negotiate a plea agreement for Mr. Marcum without

---

[22] Mr. Alderman underwent in-patient and out-patient treatment; had been drug-free for two years preceding the mitigation hearing; and had been "extremely helpful to other individuals suffering from addiction." *Alderman,* 229 W. Va. at 658, 734 S.E.2d at 739.

disclosing his own criminal involvement with him. But for Ms. Cisco's discovery of Respondent's professional misconduct, Mr. Marcum may have been incarcerated and respondent's actions may never have been revealed. Because respondent's ethical misconduct directly involved and, indeed, compromised, his client's interests, we do not perceive respondent's circumstances to be similar to either Mr. Sidiropolis's or Mr. Alderman's.

Finally, in determining the appropriate sanction, we must take into account the added element that respondent was an elected public official at the time the professional misconduct at issue occurred. This Court has emphasized that a lawyer who holds public office is held to a higher ethical standard because of his or her position of public trust: "Ethical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the office." *Roark*, 181 W.Va. at 261, 382 S.E.2d at 314, Syl. Pt. 3. *See also Lawyer Disciplinary Bd. v. Plants*, 239 W. Va. 347, 801 S.E.2d 225 (2017); *White*, 189 W. Va. at 136, 428 S.E.2d at 557; *Scott*, 213 W. Va. at 216-17, 579 S.E.2d at 557-58. As we have explained, "[l]awyer insensitivity to ethical impropriety . . . is one of the primary sources of th[e] lack of public confidence in the Bar. The problem is exacerbated when ethical violations are committed by an attorney holding an important public office." *Roark*, 181 W.Va. at 265, 382 S.E.2d at 318 (quoting *Graf v. Frame*, 177 W. Va. 282, 289, 352 S.E.2d 31, 38 (1986) (internal citation omitted)).

Based upon all of the foregoing, we agree with the HPS that a two-year suspension of respondent's law license is an appropriate sanction. However, we disagree

with the HPS's recommendation that the period of suspension be stayed, in its entirety, with conditions. Instead, we believe that respondent's professional misconduct warrants that he be removed from the practice of law for six months, after which time the remaining period of suspension shall be stayed, with conditions. We otherwise generally adopt the recommendations of the HPS.

## IV.    Conclusion

For the reasons stated above, we order the following sanctions:   that respondent's law license be suspended for a period of two years with a stay of the suspension after six months having been served and for imposition of a period of supervised probation for the remaining period of respondent's contract with JLAP; and immediate imposition of the remaining one-and-a-half year suspension if any conditions or requirements of the JLAP contract or other Rules of Professional Conduct are violated after a petition to this Court. We also order that  respondent be required to complete an additional nine CLE hours in ethics and/or substance abuse education in addition to the twenty-four hours already required of him by the West Virginia State Bar, with the additional nine hours being completed during the six-month suspension; that respondent comply with the terms and conditions of his JLAP contract; that respondent comply with the mandates of Rule 3.28 of the Rules of Lawyer Disciplinary Procedure; and that respondent pay the costs of the disciplinary proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

Law License Suspended and Other Sanctions